# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39712**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathan D. CITSAY**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 18 December 2020

————————————

*Military Judge:* Bryon T. Gleisner.

*Approved sentence:* Bad-conduct discharge, confinement for 4 months, and reduction to E-1. Sentence adjudged 15 February 2019 by GCM convened at Moody Air Force Base, Georgia.

*For Appellant:* Major David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Anne M. Delmare, USAF; Major Brian E. Flanagan, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KEY, Judge:

A general court-martial convicted Appellant, in accordance with his pleas and pursuant to a pretrial agreement, of two specifications of wrongful use of controlled substances in violation of Article 112a, Uniform Code of Military

Justice (UCMJ), 10 U.S.C. § 912a.[1,2] Officer members sentenced Appellant to a bad-conduct discharge, confinement for four months, forfeiture of $2,555.00 pay per month for four months,[3] and reduction to the grade of E-1. The convening authority disapproved the forfeitures, but otherwise approved the sentence as adjudged.[4]

On appeal, Appellant asserts his sentence was inappropriately severe based upon the conditions of his pretrial confinement, and he asks us to set aside his bad-conduct discharge as a remedy. Appellant initially sought credit at trial for these conditions, but he withdrew his motion in the midst of presenting evidence supporting his claims. Finding no error prejudicial to the substantial rights of Appellant, we affirm the approved findings and sentence.

## I. BACKGROUND

In early 2018, three years after entering active duty, Appellant came under investigation for an alleged sexual assault. While that investigation was ongoing, Appellant was accused in July 2018 of using controlled substances, and a subsequent urinalysis indicated Appellant had consumed both cocaine and methamphetamine. This accusation, along with other issues not pertinent here, led Appellant's commander to order him into pretrial confinement.

Because Moody Air Force Base—where Appellant was stationed—did not have a military confinement facility, Appellant was placed into confinement in the Lowndes County jail in Georgia pursuant to a memorandum of agreement between the base and the county sheriff's office. Three days later, Appellant's trial defense counsel unsuccessfully argued for Appellant's release at Appellant's pretrial confinement hearing. In support of his argument there, trial defense counsel submitted a short written unsworn statement from Appellant in which Appellant said being in confinement was "miserable." In this statement, Appellant alleged, *inter alia*, that he was being housed with the general population; that he was not sleeping due to fights and people whispering his last

---

[1] Appellant pleaded not guilty to and was acquitted by officer members of a charge of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] This amount exceeded the maximum forfeitures Appellant was subject to. Because the convening authority ultimately disapproved all forfeitures, this error has no impact on Appellant's case.

[4] The pretrial agreement did not have any impact on the sentence the convening authority could approve.

name; that he was not given clean toilet paper; that he had not received "quality medical care" and he was "worried that [he was] not receiving [his] seizure medication;" and that because he was classified as a maximum security prisoner, he was "paraded around base in handcuffs."

Three days after the hearing (six days after Appellant was ordered into confinement), Appellant's trial defense counsel sent an email to the acting chief of the military justice section at Moody Air Force Base asserting Appellant's father had told him that Appellant did not have a toothbrush for his first three days in confinement; that Appellant was unable to bathe; that the shared toilet in his cell was "full of poop;" and that "there remains concerns about [Appellant's] medication." Trial defense counsel said he "[w]ould appreciate it if [the acting chief] can triple check that [Appellant] is receiving the correct seizure medication" because Appellant "has a history of bad reactions to some seizure medication." He further requested Appellant be transferred to a military confinement facility. The acting chief responded the following day that the jail had advised him that inmates are not immediately issued toiletry items until it is determined how long they will be at the facility, but that inmates awaiting this determination would be given toiletries, such as toothbrushes, if they requested them. The acting chief further relayed that Appellant had access to three showers; that inmates are provided two rolls of toilet paper per week; that jail personnel would investigate the toilet in Appellant's cell, but Appellant could always raise such concerns directly with jail staff so that they could be addressed; and that he believed Appellant was receiving the medication prescribed by military medical providers, but that he would continue to investigate the matter.

After another two weeks passed, trial defense counsel sent an email to the deputy chief of the military justice section, again requesting Appellant be transferred to a military confinement facility. He noted that "[i]t's still unknown . . . whether [Appellant] is taking the appropriate seizure medication" and asserted Appellant was "subject to fighting amongst inmates and other inmates exposing themselves;" that Appellant did not have the opportunity to go outside or work out; and that Appellant was "not eating much." The deputy chief replied that she had personally visited the jail that afternoon. She wrote, "While I am not denying that [Appellant] may have some grievances as to his condition, I can assure the Defense that the conditions are not as grave as [Appellant] indicates. However, we are working diligently to transfer [Appellant]." After spending 50 days at the Lowndes County jail, Appellant was transferred

to a military confinement facility, where he remained through the conclusion of his court-martial, 170 days later.[5]

Approximately one month before his trial began, Appellant made a motion for appropriate relief, requesting additional credit for his pretrial confinement. Appellant sought three-for-one credit for the time he spent at the county jail and two-for-one credit for the time he spent in military confinement under Article 13, UCMJ, 10 U.S.C. § 813.[6] In addition to reiterating the complaints above, the motion asserted "there were no safeguards that prevented foreign nationals from being confined with [Appellant]," in violation of both the jail's memorandum of agreement and Article 12, UCMJ, 10 U.S.C. § 812.

At trial, Appellant pleaded guilty to the drug offenses and not guilty to sexual assault. Once both parties rested and the members began their findings deliberations on the sexual assault charge, the military judge took up the Defense's pretrial confinement motion. In support of the motion, trial defense counsel submitted a stipulation of expected testimony of a Lowndes County jail nurse, Ms. SB, and a letter Appellant's mother had sent to the base Inspector General complaining about Appellant's confinement conditions.

According to Ms. SB's stipulation, she reviewed Appellant's medical records which disclosed Appellant saw a jail doctor the day after Appellant was ordered into confinement. At that time, Appellant told the doctor he had been taking a particular anti-seizure drug, Aptiom, and that he had previously had a bad reaction to a different anti-seizure drug, Keppra. Aptiom, however, was not part of the jail's formulary, and the doctor prescribed Depakote, another anti-seizure medicine. Three weeks later, Appellant began refusing to take the Depakote, complaining of side effects. Ms. SB's stipulation explains Appellant told jail medical providers he preferred to take Aptiom, which he had been prescribed by a military medical provider, and he had a prescription for it "at home." The jail providers told Appellant he could be given the Aptiom if someone would bring the medication to the jail, but no one ever brought any. Meanwhile, the jail providers prescribed Appellant another anti-seizure medicine,

---

[5] Appellant returned to the Lowndes County jail for two days for a motion hearing prior to trial as well as for his court-martial proceedings.

[6] Although Appellant's basis for seeking additional credit related to the military confinement facility is not entirely clear from the motion, it appears Appellant was alleging his unit leadership did not visit him frequently enough. The record in Appellant's case does not disclose any other complaints he may have had regarding the military facility.

Dilantin, which he took without complaint. The jail providers further requested medical records from the military related to Appellant's seizure treatment and learned the military providers had given Appellant "a sample kit" of Aptiom with directions to return to the military provider to have his Aptiom levels checked after six weeks, but no further information was provided in response to the records request.[7] When Appellant returned to the Lowndes County jail three months later for a one-night stay in conjunction with a motion hearing, he told the jail medical staff he was not suffering from seizures and did not indicate he was taking anti-seizure medication. Appellant's mother's letter, which was apparently written about the same time Appellant began refusing to take the Depakote, primarily focused on her concern that the jail medical personnel were giving Appellant a medication other than the one prescribed by his military providers without an adequate transition period between the two drugs.

After submitting the two documents, the Defense called Airman Basic (AB) CL to testify about his experience being confined at the county jail pursuant to his own court-martial sentence, although AB CL was not confined with and had never met Appellant. AB CL's testimony was interrupted when the members returned with their verdict, and the military judge commenced sentencing proceedings. Once the members returned to the deliberation room to begin deliberating on a sentence for Appellant, the parties returned to AB CL's testimony. AB CL recounted how he had "strong suspicions" he was housed with foreign nationals; jail medical providers gave him the wrong medication "on accident . . . at times;" his sleeping mat was torn up and bug-infested; he was given a roll of toilet paper and soap when he arrived but did not receive a toothbrush for his first month of confinement; he only received a Styrofoam cup and a spoon for his entire four-month period of incarceration; and he was housed with inmates who exhibited poor hygiene practices. AB CL also explained that when inmates first arrive at the jail, they are placed in "A Pod," which is a temporary holding area. He said A Pod was "dirty" and "doesn't really get cleaned or kept up on just because people are in and out of it so much." He noted there was "food everywhere" and sometimes "six or ten people sleeping in there" despite there being only six bunks.

After AB CL was dismissed, the Defense called Captain JC, the jail administrator, who testified about the jail facilities and procedures. He explained that foreign nationals were generally only held at the jail for up to 48 hours in a "courtesy hold" status until immigration officials could take custody of them. He asserted that jail personnel sought to keep military confinees separated

---

[7] This six-week period expired about a month and a half prior to Appellant being ordered into confinement.

from foreign nationals, but sometimes they would be housed together "by sheer accident or coincidence [or] bad luck" based upon the need to move inmates around and the challenge of determining whether any given confinee was a foreign national in the first place. Captain JC said inmates are provided toiletries when they first arrive as well as two rolls of toilet paper and a bar of soap every week. He confirmed inmates only receive plastic spoons and Styrofoam cups, although inmates are free to purchase plastic cups with lids from the jail commissary. He said that inmates spent "three to four to five days on average" in A Pod, but Appellant was there for seven days. He described A Pod as having multiple housing areas, each with several cells with various capacities depending on the size of the cell, and he said Appellant was held in the A-3 housing area which has a total of 60 inmates with cells each housing up to 16 people. Captain JC testified there was one toilet per cell and there was no air conditioning due to the age of the facility, but the staff would use fans to keep the heat down. He said the hottest he had seen the A Pod cells reach was 85 degrees. Captain JC also explained Appellant did not file any grievances during his initial 50-day period of confinement, although Appellant did file two grievances when he returned to the county jail for his court-martial. Captain JC did not know the subject of Appellant's grievances, and no further information about these grievances is in the record.

Before trial defense counsel completed their direct examination of Captain JC, the members reached their sentence, which included confinement for four months—well short of the 220 days of pretrial confinement Appellant had already served. Once the members were excused, the military judge turned to the Defense and asked, "We have to put on the record, you're withdrawing, I understand, your Article 13 motion?" Trial defense counsel responded, "That's correct. Yes, Your Honor." The court adjourned immediately thereafter.

In seeking clemency from the convening authority, trial defense counsel submitted a letter alleging Appellant did not receive the correct medication at the Lowndes County jail and that Appellant was confined with foreign nationals, noting the Defense "was only able to establish some evidence of this on the record." Trial defense counsel attached a letter from Appellant, but all Appellant said about his pretrial confinement—both at Lowndes County and in military custody—was that it "left an indelible impression of the consequences of [his] mistakes." Appellant requested "leniency" with respect to his adjudged bad-conduct discharge.[8] The convening authority's staff judge advocate advised the convening authority to disapprove the adjudged forfeitures based on

---

[8] The convening authority had no authority to disapprove, commute, or suspend Appellant's bad-conduct discharge. *See* R.C.M. 1107(d)(1)(B). The exceptions to that rule in R.C.M. 1107(d)(1)(C) did not apply in Appellant's case.

the fact the members had arrived at an impermissible forfeiture amount, in addition to the fact Appellant had served more time in jail than he was sentenced to. Following this advice, the convening authority disapproved the forfeitures in their entirety.

## II. DISCUSSION

### A. Law

An appellant is entitled to credit for time spent in lawful pretrial confinement against his adjudged sentence. *See United States v. Allen*, 17 M.J. 126 (C.M.A. 1984). Such credit is only applied against confinement, and there is no requirement to grant credit for lawful pretrial confinement beyond the amount of confinement adjudged at trial. *See United States v. Smith*, 56 M.J. 290, 292–93 (C.A.A.F. 2002); *United States v. Oliver*, 56 M.J. 779, 783 (A.F. Ct. Crim. App. 2002).

Whether an appellant is entitled to sentence relief due to a violation of Article 13, UCMJ, is a mixed question of law and fact. *See United States v. Savoy*, 65 M.J. 854, 858 (A.F. Ct. Crim. App. 2007) (citing *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997)). The burden of establishing entitlement to such relief is on the appellant. *See United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citation omitted).

"Article 13, UCMJ, prohibits two things: (1) the imposition of punishment prior to trial, and (2) conditions of arrest or pretrial confinement that are more rigorous than necessary to ensure the accused's presence for trial." *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005). Under the first prohibition, we examine the intent of the confinement officials and the purposes of the restrictions or conditions at issue. *Id.* (citations omitted). Under the second, we consider whether the conditions were "sufficiently egregious [to] give rise to a permissive inference that an accused is being punished, or the conditions . . . so excessive as to constitute punishment." *Id.* at 227–28 (citations omitted). In the face of Article 13, UCMJ, violations, we have discretion to provide relief in the form of disapproving a punitive discharge. *See United States v. Zarbatany*, 70 M.J. 169, 175 (C.A.A.F. 2011).

At the time Appellant was ordered into pretrial confinement, Article 12, UCMJ, directed that "[n]o member of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces."[9]

When an appellant fails to seek sentence relief for pretrial punishment, the issue is forfeited absent plain error. *United States v. Inong*, 58 M.J. 460, 465 (C.A.A.F. 2003) (citation omitted). An appellant, however, may affirmatively waive his or her Article 13, UCMJ, rights at trial. *See United States v. McFadyen*, 51 M.J. 289, 291 (C.A.A.F. 1999). When an appellant "intentionally waives a known right at trial, it is extinguished and may not be raised on appeal." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citation omitted). An appellant "may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995).

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citation omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

**B. Analysis**

Appellant raised his pretrial punishment motion based on Articles 12 and 13, UCMJ, at his court-martial, yet he withdrew that same motion after the members returned with their sentence. Moreover, Appellant withdrew his motion while still presenting evidence, before the Government had the oppor-

---

[9] On 1 January 2019, an amended version of Article 12, UCMJ, went into effect, adding the further requirement that such foreign nationals must be "detained under the law of war."

tunity to present evidence countering Appellant's claims and before the military judge ruled on the motion. In doing so, Appellant intentionally gave up his right to seek relief under Article 13, UCMJ—a right he was well aware of, given the fact he had raised the motion in the first place—thereby waiving this issue on appeal. Considering the broad latitude to waive known rights at trial, we see no reason to treat Appellant's Article 12, UCMJ, allegations differently, and we conclude he has waived that issue as well. Recognizing our authority under Article 66(c), UCMJ, to apply the rules of forfeiture in the face of Appellant's waiver, we decline to do so here. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018).

Although Appellant does not concede he waived his opportunity to seek relief under either Article 12 or 13, UCMJ, on appeal, he seeks to recast his claims regarding his pretrial confinement conditions as an assertion that his sentence was rendered inappropriately severe by virtue of those conditions. Appellant's argument, however, faces strong headwinds. While we conclude our broad authority under Article 66(c), UCMJ, to "do justice"[10] permits us to determine that an adjudged sentence has been rendered inappropriately severe by virtue of pretrial confinement conditions, Appellant's argument here is complicated by the fact that—because he abandoned his motion mid-stream—we are left with an undeveloped evidentiary record. As a result, Appellant's claims of severe pretrial conditions are built on a shaky factual foundation. For example, there is no allegation, much less evidence, in the record that Appellant was ever confined in immediate association with any foreign nationals who were not members of the armed forces. Captain JC said the jail staff tried to keep foreign nationals separated from military confinees, but sometimes they were unsuccessful in doing so. He also explained foreign nationals typically only spent a very short period of the time in the jail, primarily just waiting to be retrieved by immigration officials. AB CL did say that *he* encountered people whom he believed were foreign nationals during his period of incarceration. What is missing from this evidence is any indication *Appellant* ever encountered any foreign nationals at all while he was incarcerated at the Lowndes County jail. Without more, Appellant has not established a factual predicate for any Article 12, UCMJ, violation. At most, he established that he faced a risk of being confined with foreign nationals, and the simple risk of such a violation does not render his sentence inappropriately severe or otherwise warrant relief.

The substance of Appellant's claims comes not from sworn testimony or an affidavit or any evidence which would be admissible under the Military Rules of Evidence. Instead, his first-hand claims are based upon the short unsworn

---

[10] *See, e.g.*, *United States v. Kelly*, 77 M.J. 404, 407 (C.A.A.F. 2018).

statement he submitted during his pretrial confinement hearing three days after he was ordered into confinement. Beyond this unsworn statement, the remaining support comes from second- and third-hand sources, such as emails from his trial defense counsel to the base legal office relaying conversations with Appellant's father and the letter from his mother to the Inspector General. The issue that most consistently arises in these documents is Appellant's concern about his medication, but the most definitive source of information produced regarding that issue is the stipulation of expected testimony from the jail nurse, Ms. SB. That stipulation recounts how Appellant was prescribed an anti-seizure medication when he was first ordered into confinement after it was determined that Appellant's requested medication was not included in the jail's formulary. When Appellant stopped taking that medication and complained of side effects, the jail not only prescribed him a different medication, but also gave him the option of having his preferred prescription of Aptiom delivered to him at the jail—an option Appellant did not avail himself of. Far from giving rise to an inference of an intent to punish Appellant, the evidence in the record paints a picture of jail personnel seeking to provide Appellant appropriate medication within the limitations of the jail's formulary. No evidence was presented that the conduct of the jail personnel was unreasonable or did not meet medical standards of care or was carried out with any ill intent. Moreover, there is no evidence in the record indicating either the nature or severity of Appellant's alleged side effects to the drug he was prescribed, further hampering Appellant's claim of unduly rigorous confinement conditions.

Appellant's other claims are similarly ill-formed, if not out outright contradicted by other evidence. For example, in the unsworn statement he submitted at his pretrial confinement hearing, Appellant claimed he had not received "clean toilet paper." Captain JC, on the other hand, testified that all inmates were given two rolls of toilet paper along with a bar of soap each week. AB CL corroborated this when he testified he received both toilet paper and soap when he processed into the jail. Appellant's claim is somewhat ambiguous on its face—that is, whether he is saying he received no toilet paper at all, or that he deemed whatever he did receive to be less than "clean." In the face of the sworn testimony from Captain JC and AB CL, Appellant has not met his burden of establishing he was actually denied toilet paper, much less that any such denial was carried out in order to punish Appellant. We find it significant that Appellant filed no grievances with the Lowndes County jail during his initial 50 days of confinement there, a fact which further undermines his claims of egregious conditions. In order to demonstrate a violation of his rights while in confinement, Appellant has the burden of producing actual evidence supporting his claims. He failed to do so in the record before us.

We have considered all matters in the record regarding Appellant's military service record, the nature and seriousness of his offense, and the clemency

granted by the convening authority. We conclude his sentence to a bad-conduct discharge, four months confinement, and reduction to the grade of E-1 is not inappropriately severe. We have further considered the conditions of his pre-trial confinement that were established in the record, and we determine they do not operate to render the sentence adjudged at his trial unlawful or otherwise unwarranted. We therefore decline to exercise our Article 66(c), UCMJ, authority to reduce the sentence as approved by the convening authority.

### III. CONCLUSION

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court